Good morning, ladies and gentlemen. Welcome to the Ninth Circuit. Judge Smith and I are grateful once again to welcome our colleague Tom Nelson, who is in Boise. Judge Nelson, are you all hooked up? Can we hear you? I can hear you. Can you hear me? We can hear you. On the calendar today, the first two cases are submitted. That's United States v. Javier Rodriguez and United States v. Ruiz Lopez. And we will take the cases in order. The next case will be United States of America v. and I don't know whether this is Rocha or Roche, but we intend to be informed by counsel, so. Good morning, Your Honor. May it please the Court. Gene Vorovyev on behalf of Mr. Rocha. And I make an assumption just as you are. I'm telling you to call his name something else. Thank you. Well, we raised several issues, and unless the Court has a different preference, I was going to talk mostly about issue number two in the original opening brief. And if I have any time left, I wanted to touch on the brief on the sentencing issue. And I will reserve two minutes for rebuttal, with the Court's permission. Regarding issue two, which is sufficiency of the evidence to support my client's conviction for assault with a dangerous weapon, the issue is one of statutory interpretation. Does the term dangerous weapon cover body parts? And for several reasons, I believe that the answer should be no. Looking at the language itself, there is no definition of a dangerous weapon in the statute itself, but the most common use of the term weapon really connotes an extrinsic object. I mean, once it's an extrinsic object, then it goes to a jury as to whether or not it was used in a manner likely to endanger life or serious bodily injury. How do you address the issue of the Riggins case and Sturgis, where it suggested that what constitutes a dangerous weapon is a question of fact for the jury? Well, I believe in Riggins, the Court said that any object can be a dangerous weapon. And I think that sort of supports what we're saying, because an object, unless Congress says otherwise, I think that's not a common inference that an object would be referring to a body part. So, for example, I mean, I looked at the video of this, and it's a very violent thing. And let's take it out of the context of your client. Let's assume it was some expert in kung fu, you know, the hands or the weapons and all that sort of thing. And that person comes in and starts smashing somebody up. Is it your position that hands, say, in that context, could never be a weapon? Well, in that hypothetical, I think the defendant's conduct would be covered by several other specific categories. And what might those be? Well, most likely, there are going to be substantial bodily injuries, and I believe that's one of the categories by which assault is aggravated. Well, in this case, I mean, the guy hit his head on the floor. Apparently, according to the coroner, that wasn't the cause of death, but there were some contusions and so on. But let's just say hypothetically that he'd fallen in a different way, and it cracked his skull open. What difference would there be between pulling the guy's legs out from under him with his hands and the kung fu guy who cracks his head open with his hands? Your Honor, just a brief observation. I believe the cause of death was puncture wounds. No, I understand that. That's what I'm saying. In this case, it was not the head wound. Oh, I misunderstood you. If I misspoke, I apologize. But what I'm saying here, I acknowledge that the coroner did not think that your client caused the death. My point was that if you change the hypothetical or change the reality and say, for example, that instead of dying of puncture wounds, that this guy's head cracked open when he hit the cement because your client pulled his legs out from under him, would that change the results in this case as far as whether or not the hands were a dangerous weapon, or is it solely a question of construing the statute that cannot be consistent with the other parts of the statute? I think it's just a question of the statute. I think even in that hypothetical, the use of the hands themselves, that would not constitute the use of a dangerous weapon. I'm not sure that the court necessarily has to reach that broadly in this case, but to answer your hypothetical, I don't think it's still a dangerous weapon. What if it was a headbutt? I'm sorry? What if it was a headbutt? He hit him with his head. I understand where the court is going with this. It's still the body part. It's not extrinsic. But it does suggest sort of a use of a body part in a way in which the head wasn't ordinarily intended to be used. Well, I understand that. And I would, I guess, just stick to my original position. I would still say that. It has to be extrinsic. I think it has to be extrinsic. And I do want to stress that a defendant, either in the hypothetical proposed by Judge Smith or by Judge Bybee, that conduct is reachable either because a defendant is arguably committing an act that was intended to commit murder or another felony. If he's caught, if the victim's caught. There's no question here that your client could have been convicted of something under 113. Right. The question is whether they can get him under this particular provision. The jury hasn't given the government any other out. They're stuck with it. What do you do with a Sturgis case where we've got an HIV positive prisoner who uses his teeth? Now, is Sturgis just inconsistent with your theory and you're just inviting us to withdraw it? Or can you distinguish it on the grounds of the fact that he was HIV positive? Well, I think you can do both. I think, number one, the fact that a defendant in Sturgis was HIV positive, you could say he was acting with intent to commit murder or serious or another felony. So you could arguably get him under another provision. But aside from that point, I think so long as you're not talking about an extrinsic object, I think the way this statute was drafted, you know, as long as you have unaided body parts, you can't say it's a dangerous weapon just based on how this particular statute is drafted. Congress could have done it. I'm not saying that. You say Sturgis is wrong. Yes. We said that in the briefing. I think that I'm saying that now. And it is an open question for the Ninth Circuit. Because Riggins basically said that any object can be considered a dangerous weapon depending on the manner of its use, which kind of begs the question, well, is a body part an object? What's in the meaning of this statute? Okay. Does the Court have any other questions on this particular issue before I jump? Oh, you know, I did have one point to add. And I did submit a 28J letter two days ago. I know counsel got a copy of it. I'm not sure if the Court has received a copy of it. The point that I'm pointing to is Santos' case, Nancy's v. Santos. It's a very recent Supreme Court decision, 128 S.C.T. 2525. I'm sorry, 2025 is the pinpoint side. And my position is basically that even if the Court were to find hypothetically that the statutory language doesn't really resolve this one way or the other, I mean, you can kind of read the statute either way. I think the rule of lenity most recently expressed by the Supreme Court in Santos would still require you to interpret the statute most favorably to my client and to find that it doesn't cover unaided body parts as dangerous weapons. I did the legislative history research. My research does not show that this was an issue that the Congress had considered in enacting the federal assault statute. And I would agree that the statute can be read either way, meaning as covering body parts or as not covering body parts, without making it absurd. And in light of those facts, I think the rule of lenity would come into play still, and it should inure to my client's benefit. And like I said, I did submit the letter two days ago. Okay. If we don't have it, we will shortly, I'm sure that we will shortly have it. Yes, sir. Moving on to the sentencing issue, the only thing I wanted to emphasize on that would be to ask, to urge the Court to review the videotape without really the customary deference you would have to the district court's finding of fact. The normal appellate statute would be that you would defer to district court's finding of fact. You only reverse it for clear error. And I would respectfully suggest that in this specific situation, the Court is standing in no worse position than the district court or as a jury in viewing that videotape. The portion that's key to the sentencing argument. What deference do we owe to the district court, if any? Well, are you talking about the specific issue? The sentencing issue. Well, normally you would defer to their findings of fact. But I think to the extent that you're looking at this specific portion of the videotape, that's in dispute. So you're suggesting that in effect, that because it's a videotape, we're going to conduct a de novo review and make our own factual determination. I would think that the recent Supreme Court decision of Scott v. Harris sort of virtually compels it because it was a seven-to-one decision. And, you know, admittedly it was a summary judgment motion, but I think the general. This is the speed chase in Georgia. Yeah. Yeah. And the Court actually chastised the lower court for essentially applying the traditional standard of deference to the exclusion of what the videotape actually showed. And I would also submit that this Court has an easier task than the Court in Scott v. Harris because my understanding of that opinion is that there was a chase shown on the tape. District Court came to conclusion one. The Supreme Court looked and said there's no way a reasonable jury could find the way that you described it. So we're just not going to go with that interpretation. Here you have a portion of the tape that, you know, I will submit to the Court's view of it. I've watched it probably a dozen times. The key portion, once basically my client takes the legs from under Mr. Scarpazzi, from that point on until he actually walks away from the fight, it's a blur of dots. So that's not an issue where you could say, well, you know, the district judge viewed it one way. We viewed it the other way. Is there experts at fact-finding? So we're going to defer. I mean, if you can't see it, you can't be as much of an expert as anybody. It doesn't really help you. And for the same reason, I think Agent Hodak's testimony, who was, I think, essentially interpreting this for the jury, thinks that should be given fairly little weight because he was not an eyewitness to this fight either. So he was basically narrating. Taking that all into account, why should we disturb, assuming for discussion purposes, if you were not to succeed on the other elements of your appeal, this was a within-guidelines sentence. What is unreasonable about it? Did the court error in 3553A applications? What should we be looking at from your perspective to show that the district court was in error? Well, there were, I think, the two factual problems that were underlying the court's imposition of sentence was, number one, the court's view of how the crime took place. And I think I've just discussed that. The other one was the gang affiliation. And I will, you know, I think that issue has been well covered in the brief. I don't think there is any evidence that this was in any way, shape, or form a gang-related attack. There's just no indicia of it being gang-related. Yeah, but the evidence on the gang isn't necessarily to be found on the videotape, right? Right. There's other evidence of that on which we can defer to the district court. True. I understand your point about the videotape. Your point is to the extent that the findings are based on the videotape, we've got as good a view as anybody else. Right. But once we get beyond the videotape, then we're going to have to defer to the district court, aren't we? Well, you would have to defer to the district court if there was evidence to support the finding. I mean, clear error doesn't mean no evidence. I mean, there has to be some evidence supporting a finding that this was, as the court said, to promote my client's gang affiliations. And finally, what makes it substantive and reasonable is that it's a very high, it's the highest possible sentence you could have gotten. The PSR recommended a very low, basically the bottom of the guideline sentence. It was a very reasonable analysis. The court, I would say, ignored it. I mean, the problem is not that they didn't explain, that they didn't properly explain the sentence, but that the court appears to have not given this any weight. And I would respectfully suggest that the court apply to this sentence the same appellate scrutiny as Judge Bybee suggested in his dissent in Whiteside, which is, I mean, there has to be some evidence supporting the court's findings. And if the court makes a clear error in judgment and goes from a very bottom end of the range to the very high top end of the range, without really any justification and ignoring key evidence, I think that represents a substantive error of judgment, and that should require reversal of the sentence. Counsel, you have about 45 seconds. Do you want to reserve that for rebuttal? Yes, sir. All right. Let's hear from the government. May it please the Court, good morning, Your Honor. It's Tony Raphael on behalf of the United States. Taken as a whole, defendants' arguments in this case mean that a defendant who goes after a victim, attacking him from behind, a victim who's 6 feet 6 inches 300 pounds, lift him by his feet, causing him to go airborne and body slam him on the ground, then tries to push him over the railing 13 1⁄2 feet down into a concrete floor, is either guilty of attempted murder or assault with intent to commit murder, which carries a statutory maximum of 20 years, or a simple assault, which carries a stat max of 6 months. We submit that under the statutory scheme of Section 113, Congress did not anticipate or intend such a result. But, Counsel, you know, with respect, the statute is pretty clear about what it covers, and there are several things that could be covered here. But, you know, whether Congress intended this or not, we have to look at the words, see what the words say. And 113 has seven parts. You didn't charge him with assault with intent to commit murder, did you? We did, Your Honor, and the jury found him not guilty on that. Okay. All right. So then the jury's made that decision. So then you're left with the residual issues, assault with a deadly weapon, or assault by striking, beating, or wounding, that seems to fall to be what we're dealing with here. The fact that all these subparts were covered, and you charged a lesser crime, why do you say that Congress couldn't have intended that? And they may not have intended this particular factual situation, but just looking at the words themselves, doesn't it appear that what happened here more likely falls under subpart 4, 113.4, which is assault by striking, beating, or wounding, than assault with a dangerous weapon. Isn't that kind of a strained analysis of that language? And, Your Honor, if I may, when we look at 113 in total, what we see is that it's a graduated system of punishment. What do I mean by that? The more serious the offense is, the more serious or dangerous the conduct is, the more serious the punishment. There's a simple assault and simple batteries that are covered under the statute, and those essentially deal with, for example, simply striking someone. Could you have charged him under part 6, which is assault resulting in serious bodily injury? In this case, Your Honor, we could not prove that the injuries suffered by the defendant to his face were serious bodily injuries. If you can't prove the serious bodily injury, why do you think you get 10 years and why are you impressing on us this graduated system? The jury came back and they couldn't find assault with intent to commit murder. You're telling us that you couldn't get assault resulting in serious bodily injury, so don't even talk to us about the bodily injury. If you can't prove it, you haven't got a case. Why doesn't that simply become simple assault? Your Honor, what you have in this case is someone trying to throw someone over the railing, 13 1⁄2 feet down. But he didn't throw him over the railing. If you'd thrown him over the railing, you would have assault resulting in serious bodily injury because it was 13 1⁄2 feet down. What the government is saying, when you try to throw someone over a railing, that's conduct that's in your stock, just like this was the case here. The defendant was not successful. When you try to throw someone over a railing, this conduct is a lot more serious than simply striking someone. But aren't you trapped? You're capped by the language of the statute. And it seems to me, counsel, you're making the very argument that I would make for the opposition about why you can't have an assimilation argument under California Penal Code 245 because it seems like the only difference that you've got here is the term of imprisonment. It seems like the government is expressing understandable frustration that the way the law is written, it can't get the length of sentence for this man's conduct that it feels is appropriate. It didn't win on the murder case. You've conceded to Judge Bybee that you couldn't charge him with serious bodily injury, so you're left with these lesser offenses except for the assault with a dangerous weapon. And I think even the government would concede that this is a ‑‑ at best it would be a strained construction, notwithstanding Sturgis. Your Honor, I think what we submit is that under Lewis, there is a gap in this case. There is a gap in the law. And the Supreme Court made it clear in Lewis that although the federal murder statute is comprehensive, the assault statute is not. And when you look at the federal assault statute, what's missing from there, the gap that's there is assault with intent to commit serious bodily injury. And that's what 245A1 from the California Penal Code is. So looking under the ‑‑ It's the intent part rather than resulting in that you're talking about. That's correct, Your Honor. Isn't it covered by assault by striking, beating or wounding? The intent part is there. You don't have to approve the intent. You've got a clear conviction there, but it's just a lesser term which undercuts your assimilation argument, doesn't it? We submit, Your Honor, it's a different character. And we point to the Souza case, a 2004 case from this Court. Judge Bivy, I believe, was on that panel. It's a decision by Judge Beeser, if I'm not mistaken. And there, Your Honor, you had a statute. It was a case out of Hawaii that we cited. And the defendant went into a car parked in the national park, broke into the car and stole items. There were three Federal statutes, including the Federal theft statute and two regulations that would have convicted him. But the government in that case assimilated the Hawaii statute for burglary of a vehicle. And this Court, in affirming the district court, held that breaking into a car, although there are all these other statutes, theft, trespass, all of that, breaking into a car, burglary of a car, which is under the Hawaii statute, is of a different character. And that's what we have here. But we don't have that here, do we, counsel? Because 245, California Penal Code 245 and the relevant portion of 113 of 8 U.S.C. have exactly the same, almost the same language. The only difference is the term of punishment. Isn't that correct? Your Honor, the 113, the Federal statute 113 does not have assault with intent to commit serious bodily injury. It's a felony. It's a serious crime. And, counsel, if you had had, if assault by striking, beating or wounding had had a one-to-five or a six-month-to-five term, you wouldn't even be making this argument, would you? Your problem is that you don't like the gap in the punishment that's available under this. It's not so, I'm sorry, Your Honor, it's not so much the punishment. It's the character of the attack. And here you have an individual. Let's take a different hypothetical. Let's say you have a large individual who picks up a small child, trying to throw the child 20 feet down to a concrete pole. And what is the dangerous weapon? In that simple hypothetical, Your Honor, where you have an individual picking up a small child, without using any special techniques like we submit was done in this case, perhaps there is no dangerous weapon. And that makes the gap argument more stronger in that case, because now you look at the graduated system of punishment under 113. Clearly, Congress intended to punish conduct more seriously as that. But if you define the hands as a dangerous weapon, don't you find yourself opening up a Pandora's box? What about the young couple on a date? The guy says something inappropriate and his date slaps him. Is that a felony? Is that a Federal violation of 113? Well, again, in that case, Your Honor, we would look at what this Court has defined under Riggins as a definition of a dangerous weapon. It was the way the weapon was used. Was the way this person in this example that she gave, the way she slapped him, would that have caused serious bodily injury? What if the guy is a hemophiliac and she knows it? Well, perhaps in that case, yes. And, in fact, in Sturgis, both are two cases that we cited, the Sturgis case out of the Fourth Circuit and the Moore case out of the Eighth Circuit. Both of them deal with a bite, I believe, in a penitentiary. And both of them deal with somebody who's got HIV. That's correct, Your Honor. But the Court in Sturgis made it clear that we are not relying on the fact that the defendant had HIV in this case. In fact, the Court went to great lengths to cite some of the authority that basically said you cannot transmit, or at the time the medical authority, where HIV could not be transmitted or could not be transmitted through a human bite. What the Court relied on is expert testimony. It said, in general, human bites are very dangerous. And regardless of whether the person had HIV, and in this case, taking somebody, taking a very large person, body-slamming him, and then using those same hands to try to throw him over is also using the body part as a dangerous weapon. So head-butt would be covered. Sure, of course. Elbows, knees, a kick. Of course, yes. A punch, an open slap. Then, Your Honor. How about a shove? Well, it would depend. If it's just a simple shove, that's not going to be enough. He shoves him down the stairs. Again, looking at the facts, if you have a large person perhaps shoving a small person, knowing that there are stairs down there, it's a question that's given to the jury. Okay. Counsel, I want to make sure that I understand what the government's position is here. So your position is that if we're poised over stairs or if we're near a cliff or some kind of precipice, a first floor to the second floor that's unguarded, that a simple shove with two hands in a situation in which somebody is going to fall and suffer serious injury and perhaps death, that the use of the hands in that way is assault with a dangerous weapon? Your Honor, we're asking that on the narrow facts. I'd like a really simple answer. Is that the government's position, yes or no? I don't think just simply based on those facts, Your Honor, where you don't have the body parts used in a special way, in a unique way, that the jury or that the government would advocate that the hands were used as a dangerous weapon. But the logic of your position is exactly as Judge Bybee indicates, isn't it? I mean, I hate to use the term, but it's a slippery slope. I mean, you get down there. Maybe if you were close enough to the edge, if somebody could really blow hard enough, they could blow him over the edge, so then the breath would be a dangerous weapon. I mean, you were trying to argue just a minute ago that pushing him over the railing, that attempting to push him over the railing was sufficient here. Again, Your Honor, what we're saying is that, and as this Court held in Riggins, is that you look at the manner that the object, that the body part was used. And if it's a simple use, like just simply pushing someone over the railing or over a cliff. And in this case, he grabbed him by the ankles, right? He grabbed him by the ankles. And pulls his feet out from underneath him. Okay. What if the guy had been, the victim had been trying to run from the group, and just as Mr. Rocha was coming up, and he had stuck his foot out to trip him? Again, Your Honor. And then we've got the body slam, and we've got the whole thing. The guy just loses control and falls and hits his head. The ankle is now a dangerous weapon? Your Honor, again, what makes it slightly unique in this case is that you have a very, very large victim. Six foot six. Okay. If I trip somebody who's six foot six and 300 pounds, is my ankle a dangerous weapon? What's that shrinking? What's making him 100 pounds? He's a 100 pound weakling. And he gets tripped by the same ankle that Judge Bybee referred to. Is that a dangerous weapon? Again, Your Honor, in this case what we have, we have a relatively small defendant compared to the victim. And he was able to use his hands to take the victim down into the concrete floor. To grab him specifically by the ankles. So same reason, Your Honor. Would it be any different if, would it be any different if the, your client, or not your client, but your opponent's client were the six foot four, 300 pound guy, and the person who was under attack was a very small, slight person, but was nonetheless had his feet pulled out from under him the same way here? Would the analogy change in any way by your proposal? Again, in that case, Your Honor, perhaps it would be the same. Again, what we're saying on the facts of this case, you have a relatively small defendant compared to the victim. Yet he was able to. You think that makes a difference in this case? Because of the way the hands were used. I mean, change the facts. The big, you know, say that the defendant was a pretty big guy and the person, the deceased was a really small person. Does it change the analysis of what you're proposing in any way, the way the hands were used? Perhaps on those facts, Your Honor, the hands may not have been used in a special way. Why would that be? Or take the ankle. Because simply. He's got a big ankle. He trips the guy and he falls and then they come and stab you. Let's say you have some large defendant who picks up the victim. Again, looking at those facts, Your Honor, I think when you compare it to this case, which is small defendant coming from the back, grabbing the victim and causing him to go down, then using that and continuing the attack. The government's position is that the size of the defendant versus the victim is a big deal. It's not. It's important in the fact that it affects the way the hands were used to become a deadly weapon or a dangerous weapon. Why is that? Because you have a small person using his hands to grab the victim, a very large person by the ankles, causing the victim essentially to go down. And a big person couldn't do that to a small person. Well, a big person could do that to a small person a lot easier than a small person could do it to a large person. That's what makes. The ease with which the act could occur that defines whether the hands are a dangerous weapon? Because in this case, it allowed the defendant to overtake the victim and then to try to throw him over. And that's what made his hands a dangerous weapon. And the jury was given a special verdict form, and the jury picked the dangerous weapon being the hands in this case over the concrete floor. Okay. I think your time is up. I think we understand the argument. Thank you. Counsel, you have a minute remaining. On the Sturgis case, the court actually, I have a copy, the court did cite the HIV status as one of the factors in finding that the use of the teeth was, this would have made it a dangerous weapon. And the pinpoint site is 48F3D at page 789. And I did want to focus my sentencing argument a little bit because I think I rushed through it a bit. The district court imposed 87 months based on very specific findings regarding how the crime occurred and the gang nature of the attack. If you take those findings out, it's not clear at all that the district court would give my client the same sentence. And whether the record could be somehow manipulated hypothetically to come up with the same sentence, I think it is irrelevant. If you take away key reasons for the court speaking of a particular sentence, you have to give the court an opportunity to re-sentence him on the correct view of the facts, whatever the court's exercise of discretion is going to be. So if you don't agree with me on the substantive issues regarding my client's conviction, at least on the sentencing issue, I think you have to vacate and give the district court an opportunity to exercise his discretion again. And I'll let the court have other questions. I'm ready to submit. Okay. Thank you, counsel. Thank you, Your Honor. United States v. Rocha is submitted. It's on the calendar.
judges: Nelson T. G., Bybee, Smith M.